IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO.  5:15-CV-137-FL

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| SHARON J. COBHAM, | ) | |
| | ) | |
| Debtor, | ) | |
| _____ | ) | |
| | ) | |
| NICOLE LECANN and JOINT | ) | |
| ENTITIES, LLC, | ) | ORDER |
| | ) | |
| Plaintiffs - Appellees, | ) | |
| v. | ) | |
| | ) | |
| SHARON J. COBHAM, | ) | |
| | ) | |
| Defendant - Appellant.[1] | ) | |

This matter is before the court on appeal by defendant-debtor ("defendant") of a final order of the United States Bankruptcy Court for the Eastern District of North Carolina granting summary judgment in favor plaintiffs-appellees ("plaintiffs") on a claim of nondischargeability, under 11 U.S.C. § 523(a)(6).  See generally LeCann v. Cobham (In re Cobham), 528 B.R. 283 (Bankr. E.D.N.C. 2015) ("LeCann III").  The issues raised have been briefed fully, and in this posture are ripe for ruling.  For the reasons that follow, the judgment of the bankruptcy court is affirmed.

_____

[1] This case was docketed under the case caption Sharon J. Cobham v. Nicole LeCann, et al. Debtor Sharon Cobham was the defendant in the bankruptcy court below.  Accordingly, the court amends the case caption to comply with Federal Rule of Bankruptcy Procedure 8003(d)(2), which requires the clerk of the bankruptcy court to docket the case using the same title as the underlying adversary proceeding from which the appeal was taken.  All future filings in this matter should reflect the case title as amended.

## BACKGROUND

Plaintiff Nicole LeCann ("LeCann") is a dentist practicing in Raleigh, North Carolina. Plaintiff LeCann and defendant previously were classmates at the University of North Carolina School of Dentistry and, thereafter, business partners.  In the course of their partnership, they jointly owned and operated five dental practices throughout North Carolina: Sharon Cobham, D.D.S. & Nicole LeCann, D.D.S. IV, P.A. (the "North Hills" practice); Sharon Cobham, D.D.S. & Nicole LeCann, D.D.S. V, P.A. (the "Durham" practice); Sharon J. Cobham, D.D.S. & Nicole LeCann, D.D.S., P.A. (the "Burlington" practice); Sharon Jovanna Cobham, D.D.S. & Nicole Lecann, D.D.S. & Associates, P.A. (the "Apex" practice); and Sharon Cobham, D.D.S. & Nicole LeCann D.D.S. II, P.A. (the "Winston-Salem II" practice) (collectively, the "Practices").  The Practices were professional corporations, formed pursuant to the North Carolina Professional Corporations Act, N.C. Gen. Stat. § 55B–1 et seq., which subsequently have been dissolved.  Plaintiff Joint Entities, LLC ("Joint Entities") is a North Carolina limited liability company of which plaintiff LeCann is the only member.  Plaintiff Joint Entitles also is the holder of a judgment rendered against defendant and in favor plaintiff LeCann in a derivative capacity for the benefit of the North Hills, Durham, Burlington, and Apex practices by the North Carolina Business Court (the "Business Court").

Plaintiff LeCann and defendant were the only officers, shareholders, and directors of the Practices.  From 1999 to 2007, they operated the Practices amicably through an informal arrangement.  That arrangement established defendant as the president of the Practices, in charge of overall direction and leadership, with the power to transfer money, hire and fire personnel, pursue expansion concepts, and otherwise exert managerial authority.  Plaintiff LeCann managed the details

2

of the Practices, which included daily accounting, reimbursements for services, and other details of day-to-day operation.

Beginning in 2007, defendant began a series of surreptitious conflict-of-interest transactions. To accomplish these transfers, defendant either made unauthorized loans, or issued unauthorized distributions and reimbursements, to herself from the accounts of the North Hills, Durham, Burlington, and Apex practices. In addition, she also made loans to another dental practice in Winston-Salem, North Carolina, of which she was the sole owner (the "Winston-Salem I" practice). All the transfers were initiated by defendant, or by one of her family members at her direction, and few were approved by plaintiff. Defendant commingled the assets and monies of the various Practices and her solely-owned Winston-Salem I practice. Over time, the Winston-Salem II practice was absorbed into the Winston-Salem I practice.

Eventually, plaintiff LeCann learned of the transfers and confronted defendant. Plaintiff LeCann sent defendant multiple emails expressing her disapproval and demanding defendant return the funds to the appropriate Practice. Plaintiff LeCann and defendant eventually reached an impasse. On July 12, 2010, plaintiff LeCann filed complaint against defendant in Business Court.[2] Plaintiff LeCann asserted claims both in her individual capacity and derivatively, on behalf of the Practices. In her individual capacity, plaintiff LeCann asserted common law claims for breach of fiduciary duty, tortious interference with contract, and tortious interference with prospective economic advantage, as well as a statutory claim for violation of the North Carolina Unfair and Deceptive Practices Act ("UDPA"), N.C. Gen. Stat. § 75–1.1 et seq. In her derivative capacity,

---

[2] The case actually was filed in the General Court of Justice, Superior Court Division, Wake County, North Carolina, and thereafter designated a complex business case by order of the Chief Justice of the North Carolina Supreme Court pursuant to N.C. Gen. Stat. § 7A–45.4(b). Designation of a case as a "complex business case" is an administrative matter under North Carolina law.

plaintiff LeCann asserted common law claims for breach of fiduciary duty grounded in defendant's commission of constructive fraud where she entered into numerous conflict of interest transactions; conversion; tortious interference with contract; and tortious interference with prospective economic advantage, as well as statutory claims for violation of the UDPA, N.C. Gen. Stat. § 75–1.1 et seq., and seeking recovery for numerous unfair self-dealing and conflict-of-interest transactions, pursuant to N.C. Gen. Stat. § 55–8–31.

On September 17, 2010, plaintiff LeCann filed in the Business Court a motion for partial summary judgment, wherein she moved for dissolution of the Practices, pursuant to N.C. Gen. Stat. § 55–14–30 and for the appointment of a receiver. In addition, plaintiff LeCann moved the court for an order allowing her to prosecute the Practices's claims on behalf of the corporation derivatively, rather than requiring said claims be prosecuted by the receiver. Defendant opposed plaintiff's motion as it related to derivative prosecution of the Practices's claims, and contended that plaintiff had failed to make demand, as is required by N.C. Gen. Stat § 55–7–42.[3] On September 29, 2010, the Business Court entered order dissolving the Practices and appointing a receiver. Later, on October 6, 2010, defendant filed a motion for summary judgment. Therein, defendant contended that plaintiff LeCann's individual claims failed because, as a general matter, shareholders cannot recover for injuries sustained by a corporation and, in addition, plaintiff LeCann failed to satisfy any of the exceptions to that general rule established under North Carolina law. Defendant also contended that plaintiff LeCann had failed to make the statutorily required demand and could not prosecute the Practices's claims derivatively.

---

[3] Although not explicitly stated, the Business Court's order on plaintiff's motion suggests that the motion for dissolution was unopposed by defendant.  See LeCann v. Cobham, 2011 NCBC 29, 2011 WL 3329317, at *1–2 (N.C. Super. Ct. Aug. 2, 2011).

4

By order entered August 2, 2011, the Business Court granted plaintiff's motion as it related to her ability to prosecute the Practices's claims derivatively, denied as moot plaintiff's motion inasmuch as it requested dissolution, and denied defendant's motion for summary judgment. See generally LeCann v. Cobham, 2011 NCBC 29, 2011 WL 3329317 (N.C. Super. Ct. Aug. 2, 2011). By stipulation of the parties, the Business Court then set the matter for bench trial.

Trial was held before a North Carolina Superior Court judge on August 15, 2011. The Business Court's judgment entered November 7, 2012. See generally LeCann v. Cobham, 2012 NCBC 56, 2012 WL 5456095 (N.C. Super. Ct. Nov. 7, 2012) ("LeCann II"). In its judgment, the Business Court made 33 findings of fact consistent with the facts discussed above. The Business Court also made a number of legal conclusions. As relevant here, it concluded that defendant engaged in multiple conflict-of-interest transactions that were unfair to the practices and that she breached her fiduciary duty by committing constructive fraud on the Practices. Id. at *7–8. It also concluded that defendant's conflict of interest transactions were intentional and in knowing violation of her duty of loyalty owed to the Practices. See id. The Business Court awarded to the receiver compensatory damages in the amount of $234,240.00 on behalf of the North Hills practice; $174,969.00 on behalf of the Durham practice; $74,879.00 on behalf of the Burlington practice; and $75,800.00 on behalf of the Apex practice, representing a total award of $559,888.00 in compensatory damages. Id. at *4–5. In addition, based on its conclusion as to defendant's mental state, the Business Court awarded to the receiver punitive damages on behalf of each Practice by trebling the compensatory damage award made to each, pursuant to N.C. Gen. Stat. § 1D–15. The Business Court grounded its award of punitive damages in defendant's "willful or wanton conduct," as that term is defined by N.C. Gen. Stat. § 1D–5(7). Id. at *4–5, 7–8. The trebling of the

5

compensatory damages awarded on behalf of the Practices resulted in a total punitive damages award of $1,679,664.00. The total amount of the Business Court's judgment resulted in a debt of $2,239,552.00 owed by defendant to the receiver. Defendant did not appeal the Business Court's judgment.

On July 26, 2013, the receiver provisionally entered into an agreement with plaintiff Joint Entities to transfer the judgment rendered in favor of the receiver on behalf of the Practices to plaintiff Joint Entities. On August 13, 2013, the receiver filed with the Business Court a motion seeking permission to transfer the judgment. On October 7, 2013, the court entered order approving the transfer.

At the same time, pending the Business Court's approval of the receiver's proposed transfer of judgment, plaintiff Joint Entities executed upon the judgment and the sheriff conducted a sale of the stock representing defendant's ownership in the Practices. Defendant appeared at the sheriff's sale, placed a bid on the stock certificates, and was the highest bidder. Defendant paid to plaintiff Joint Entities $9,000.00, which resulted in a reduction of the total amount required to satisfy the judgment by $8,762.50.[4] This payment currently is the only payment that defendant has made toward satisfaction of the debt.

On October 8, 2013, defendant filed a voluntary petition for bankruptcy pursuant to Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 701 et seq., seeking discharge of her debts. See generally In re Cobham, 8:13-BK-6340-SWH (Bankr. E.D.N.C. 2013). On January 6, 2014, plaintiffs initiated the underlying adversary proceeding, asserting claims of nondischargeability

---

[4] Although defendant was the highest bidder at the sheriff's sale, the Business Court subsequently determined that defendant's conduct was fraud on her creditors and thus no title to the stock certificates passed. This fact is noted only for completeness and is not relevant to the court's disposition of the instant appeal.

6

under 11 U.S.C. § 523(a)(6), which precludes discharge of debts incurred as a result of "willful and malicious injury," as well as 11 U.S.C. § 523(a)(4), which precludes discharge of debts incurred as a result of "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4) & (a)(6). See generally LeCann III, 528 B.R. 283; LeCann v. Cobham (*In re Cobham)*, 8:14-AP-2-SWH (Bankr. E.D.N.C. 2014).  On May 19, 2014, plaintiffs filed a motion for judgment on the pleadings, pursuant to Federal Rule of Bankruptcy Procedure 7012.  In their motion, plaintiffs contended that the doctrine of collateral estoppel precluded litigation on the issues raised in their adversary complaint, because the Business Court's judgment already had resolved those issues.  Simultaneously, defendant filed a motion for summary judgment, pursuant to Federal Rule of Bankruptcy Procedure 7056.  In her motion, defendant argued that the Business Court's judgment could not preclude litigation of plaintiffs' nondischargeability claims, because the issues raised in the Business Court were not "identical" to the issues presented by plaintiffs' instant claims.

On March 18, 2015, the bankruptcy court entered order converting plaintiffs' motion for judgment on the pleadings into one for summary judgment, granting said motion, and denying defendant's cross motion on the same.  The bankruptcy court's order addressed only plaintiffs' claim under § 523(a)(6) for "willful and malicious injury."  The bankruptcy court held that the Business Court's award of punitive damages based in defendant's "willful or wanton conduct" was sufficient to satisfy the "willful or malicious injury" standard.  The court noted that "willful or malicious injury" requires the intent to cause injury and went on to conclude that "willful or wanton conduct," statutorily defined as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury,

damage or other harm," satisfied that standard.  See N.C. Gen. Stat. § 1D–5(7) (defining "willful or wanton conduct").

Defendant appealed to this court on April 1, 2015.  Defendant contends the bankruptcy court erred in granting summary judgment in favor of plaintiffs under § 523(a)(6) because the Business Court's award of punitive damages only establishes that she intended her actions, not the consequences of those actions.  In addition, defendant contends that, even though the bankruptcy court declined to address plaintiffs' nondischargeability claim made under § 523(a)(4), she is entitled to summary judgment in her favor on that claim because she was not a "fiduciary," as that term is used for purposes of the bankruptcy code, as a matter of law, and, in any event, because the Business Court's judgment failed to address the elements necessary to prove fraud, defalcation, embezzlement, or larceny.

In response, plaintiffs argue that the bankruptcy court properly granted summary judgment under § 523(a)(6) because the "intentional and malicious injury" standard may be satisfied upon proof of an "intentional act that necessarily causes harm."  Plaintiffs contend that the Business Court's award of punitive damages satisfies that requirement.  In the alternative, plaintiffs contend that defendant incurred the subject debt as a result of her defalcation while acting in a fiduciary capacity.  In particular, plaintiffs contend defendant was a fiduciary because she was a director of the Practices.  Plaintiffs also contend that the business court's judgment satisfies the standard for "defalcation," where it conclusively establishes that defendant knowingly disregarded her duty of loyalty owed to the corporation.

## COURT'S DISCUSSION

A.    Standard of Review

This court has jurisdiction over defendant's appeal pursuant to 28 U.S.C. § 158(a)(1).  On appeal from the bankruptcy court, this court reviews findings of fact for clear error and conclusions of law de novo.  Zurich Am. Ins. Co. v. Tessler (*In re* J. A. Jones, Inc.), 492 F.3d 242, 249 (4th Cir. 2007).  Where this case requires review of an order granting summary judgment, only legal issues here are presented for decision.

Federal Rule of Bankruptcy Procedure 7056 incorporates the standard for summary judgment articulated in Federal Rule of Civil Procedure 56.  Summary judgment is appropriate where an examination of the pleadings, affidavits, and other discovery materials properly before the court demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.

9

<u>Anderson</u>, 477 U.S. at 250.  In making this determination, the court must view the inferences drawn

from the underlying facts in the light most favorable to the non-moving party.  <u>United States v.</u>

<u>Diebold, Inc.</u>, 369 U.S.654, 655 (1962).

Nevertheless, "permissible inferences must still be within the range of reasonable probability,

. . . and it is the duty of the court to withdraw the case from the jury when the necessary inference

is so tenuous that it rests merely upon speculation and conjecture." <u>Lovelace v. Sherwin-Williams</u>

<u>Co.</u>, 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted).  Thus, judgment as a matter of law is

warranted where "a reasonable jury could reach only one conclusion based on the evidence," or

when "the verdict in favor of the non-moving party would necessarily be based on speculation and

conjecture." <u>Myrick v. Prime Ins. Syndicate, Inc.</u>, 395 F.3d 485, 489 (4th Cir. 2005).  By contrast,

when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is

created," and judgment as a matter of law should be denied.  <u>Id.</u> at 489–90.

The court may affirm the bankruptcy court on any ground supported by the record.  <u>See</u>

<u>Helvering v. Gowran</u>, 302 U.S. 238, 245–46 (1937) ("In the review of judicial proceedings the rule

is settled that, if the decision below is correct, it must be affirmed, although the lower court relied

upon a wrong ground or gave a wrong reason.").

B.      Analysis

Bankruptcy affords the honest debtor a fresh start.  <u>Wright v. Union Cent. Life Ins. Co.</u>, 304

U.S. 502, 514 (1938).  To that end, the bankruptcy code presumes that, at the conclusion of the

bankruptcy proceeding, the debtor's obligations will be discharged.  <u>See</u> 11 U.S.C. § 727(a) ("The

court shall grant the debtor a discharge.").  However, in clear recognition of the fact that certain

debts arise from obligations too important, or, in certain instances, too blameworthy to be voided,

10

Congress also has delineated several categories of debt which may never be discharged. 11 U.S.C. § 523. This case involves one debt, and whether it may be classified into either of two categories under § 523: debts incurred "for willful and malicious injury by the debtor to another entity," § 523(a)(6), or debts incurred "for . . . defalcation while acting in a fiduciary capacity." § 523(a)(4).

1.    Collateral Estoppel

This case requires the court to apply the issue preclusion doctrine, collateral estoppel. Issue preclusion applies in bankruptcy proceedings and may be used offensively to bar relitigation by a debtor of issues raised in a nondischargeability claim brought by a creditor under 11 U.S.C. § 523(a), when the same issues have been litigated previously in a separate proceeding. See Grogan v. Garner, 498 U.S. 279, 284–85 (1991). A creditor's ability to preclude relitigation by a debtor of the issues previously decided depends on whether the courts of the state in which the underlying judgment was rendered would afford it preclusive effect on the same issues. See Marrese v. Am. Acad. of Orthopedic Surgeons, 470 U.S. 373, 380 (1985). Because the judgment at issue was rendered in North Carolina the court looks to North Carolina's formulation of the issue preclusion doctrine.

Under North Carolina law, issue preclusion bars litigation of an issue, where "the issue in question [is] identical to an issue actually litigated and necessary to the judgment [in an earlier action], . . . the prior action resulted in a final judgment on the merits, and . . . the present parties are the same as, or in privity with, the parties in the earlier action." Sartin v. Macik, 535 F.3d 284, 287–88 (4th Cir. 2008). Whether the issue in question is identical to an issue actually and necessarily litigated requires satisfaction of four additional criteria:

(1) the issues must be the same as those involved in the prior action, (2) the issues must have been raised and actually litigated in the prior action, (3) the issues must

11

have been material and relevant to the disposition of the prior action, and (4) the determination of the issues in the prior action must have been necessary and essential to the resulting judgment.

Id. at 288.  With respect to the overarching collateral estoppel framework, the parties do not dispute

that there was a final judgment on the merits or that plaintiff Joint Entities is in privity with the

Practices.  However, the parties do contest the first element, whether the issues in question were

"actually litigated."  In particular, defendant suggests collateral estoppel does not preclude her

defense because the issues presented by this litigation are not "the same" as those involved in the

prior action.

Before turning to the substance of defendant's appeal, the court first addresses what it means

for two issues to be "the same" for purposes of issue preclusion.  Two issues may be "the same"

irrespective of their different names or elements.  Under North Carolina law "collateral estoppel

precludes the subsequent adjudication of a previously determined issue, even if the subsequent

action is based on an entirely different claim."  Whiteacre P'Ship v. Biosignia, Inc., 358 N.C. 1, 15

(2004).  Collateral estoppel analysis requires the court to look beyond the formal labels given to

particular causes of action and, instead, determine whether the legal issues which necessarily were

proved by plaintiff LeCann in the course of the Business Court litigation are identical to the issues

arising in the course of plaintiffs' § 523(a) claim.  See, e.g., Beckwith v. Llewellyn, 326 N.C. 569,

574 (1990) ("A very close examination of matters actually litigated must be made in order to

determine if the underlying issues are in fact identical."); see also Combs v. Richardson, 838 F.2d

112, 116–17 (4th Cir. 1988) (instructing reviewing court to review issues posed to jury by court in

jury instructions).

With this principle in mind, the court now turns to the two grounds presented for decision.

12

2.        Willful and Malicious Injury

Relying on North Carolina's collateral estoppel doctrine, the bankruptcy court held that defendant's debt to plaintiff Joint Entities was incurred as a result of "willful and malicious" injury and thus was not subject to discharge in bankruptcy under 11 U.S.C. § 523(a)(6).  In reaching its conclusion, the bankruptcy court committed legal error and thus the court departs from its analysis.

The central issue to be litigated through plaintiffs' § 523(a)(6) claim is whether defendant intended to inflict the harm suffered by the Practices.  Section 523(a)(6) renders nondischargeable debts incurred as a result of "willful and malicious injury."  11 U.S.C. § 523(a)(6).  As it is used in the statute, the term "willful" modifies the word "injury," narrowing the statute's ambit to cover "only [debts incurred as a result of] acts done with the actual intent to cause injury."  Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).  In other words "Congress intended a debt to be nondischargeable under § 523(a)(6) only if the underlying injury was a deliberate or intentional one."  Duncan v. Duncan (In re Duncan), 448 F.3d 725, 728 (4th Cir. 2006).  Here, the Business Court's analysis focused exclusively on defendant's intent to act, rather than her intent to harm.  Thus, summary judgment was inappropriate because the Business Court found only that defendant engaged in an intentional act, but not that she intentionally caused the Practices harm.

In particular, in the Business Court, plaintiff LeCann prevailed on a derivative claim for constructive fraud predicated on defendant's breach of fiduciary duty and a claim seeking recovery for defendant's self-dealing and conflict-of-interest transactions.  See LeCann II, 2012 WL 5456095, at *7–9.  To succeed on the Practices's constructive fraud claim before the Business Court, plaintiff LeCann demonstrated "that [the Practices] and defendant[] were in a relation of trust and confidence . . . [which] led up to and surrounded the consummation of the transaction in which

13

defendant . . . [took] advantage of [her] position of trust to the hurt of [the Practices]." Barger v. McCoy Hillard & Parks, 346 N.C. 650, 666 (1997) (internal quotations omitted) (third alteration in original). "Implicit in the requirement that a defendant '[take] advantage of [her] position of trust to the hurt of plaintiff' is the notion that the defendant must seek [her] own advantage in the transaction; that is, the defendant must seek to benefit [herself]." Id. (first alteration in original). To succeed on the Practices's conflict of interest transaction claim before the Business Court, plaintiff LeCann proved that defendant engaged in a conflict of interest transaction, which defendant then failed to prove that was fair to the Practices. N.C. Gen. Stat. § 55–8–31. A "conflict of interest" transaction "is a transaction with the corporation in which a director of the corporation has a direct or indirect interest." Id. § 55–8–31(a). The law presumes such transactions to be invalid and imposes upon the director the burden of demonstrating their fairness to the corporation. Id. §55–8–31(a)(3); Green River Mfg. v. Bell, 193 N.C. 367, 367 (1927).

The issues necessarily presented by either cause of action do not support the bankruptcy court's grant of summary judgment, because they are not identical to the issues that must be litigated in a § 523(a)(6) claim. Plaintiff LeCann's derivative constructive fraud claim required her to prove only that defendant acted in a manner that harmed the Practices, not that defendant intended to harm them. Thus, the Business Court's judgment established only that defendant acted to the Practices's detriment, not that defendant intended to inflict harm. See, e.g. Barger, 346 N.C. at 666; Ridenhour v. Int'l Bus. Mach. Corp., 132 N.C. App. 563, 566 (1999). In addition, a statutory claim to remedy a conflict of interest transaction requires proof only of fairness, without reference to the director's subjective intent in entering the transaction. See N.C. Gen. Stat. § 55–8–31(a)(3). Because neither claim for which plaintiff LeCann won recovery on behalf of the Practices required proof of

14

defendant's intent to harm, plaintiffs' motion for summary judgment on their discharge claim, contending defendant incurred the subject debt as a result of a willfully and maliciously inflicted injury, cannot be granted on that basis alone.

Moreover, the Business Court's award of punitive damages fails to satisfy the standard for "willful and malicious injury." Under North Carolina law, punitive damages "may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that [either 1) fraud, 2) malice, or 3) willful and wanton conduct] was present and was related to the injury for which compensatory damages were awarded." N.C. Gen. Stat. § 1D–15(a). "Willful or wanton conduct," the ground upon which the Business Court based its award of punitive damages, is defined as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." Id. § 1D–5(7). Under the plain language of that statute, a conclusion of "willful and wanton" conduct requires the defendant possess knowledge with regard to her breach of duty, and be at least reckless as to the potential for harm. Consistent with that standard, the Business Court concluded that defendant "was well aware" of the potential harmful consequences of her conduct. LeCann II, 2012 WL 5456095, at *5. The Business Court's finding of "awareness" falls short of § 523(a)(6)'s "willful and malicious" injury standard, which requires intent to harm.

Plaintiffs resist this conclusion and argue that the Business Court's finding of "willful or wanton conduct" is a sufficient basis for summary judgment on the issue of collateral estoppel where it required a finding that defendant deliberately violated the law. Plaintiffs suggest that an intent to inflict injury flows naturally from a deliberate violation of the law. However, the Fourth Circuit already has considered and rejected a similar argument, holding that "the mere fact that a debtor

15

engaged in an intentional act does not necessarily mean that he acted willfully and maliciously for purposes of § 523(a)(6)." <u>Duncan</u>, 448 F.3d at 729.  Although the Business Court concluded that defendant acted intentionally and was aware that harm might occur, § 523(a)(6) demands an analysis focused on the debtor's mental state as it relates to the consequences of an injurious act.  Because a finding of intentional injury is not identical to the issues necessarily litigated before the Business Court, it was error to afford that court's judgment preclusive effect and grant defendant's motion for summary judgment on that basis.

In addition, plaintiffs contend that the bankruptcy court's grant of summary judgment is justified by rule in <u>McIntyre v. Kavanaugh</u>, 242 U.S. 138 (1916), a case cited favorably by the Supreme Court in <u>Geiger</u>.  In <u>McIntyre</u>, the Court noted that "A [willful] disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done [willfully] and maliciously, so as to come within the exception."  <u>Id.</u> at 141–42.  However, plaintiff's reliance on <u>McIntyre</u> is misplaced.  The rule in <u>McIntyre</u> is not meaningfully different from that articulated by the Court in <u>Geiger</u>, in that it requires an injury in the nature of an intentional tort.  <u>Compare</u> <u>Geiger</u>, 523 U.S. at 61, <u>with</u> <u>McIntyre</u>, 242 U.S. at 141–42 <u>and</u> <u>Restatement (Second) of Torts</u>, § 8A & cmt. b.

<u>McIntyre</u>'s requirement than an injury necessarily result from the occurrence of a bad act, in essence, requires that the act itself inevitably produce the injury in all circumstances.  <u>See</u> <u>Oxford English Dictionary</u>, "necessarily," <u>available</u> <u>at</u> http://www.oxforddictionaries.com/us/definition/american_english/necessarily (last accessed Dec. 1, 2015).  That standard cannot be met here.  The Business Court grounded its punitive damages award in defendant's repeated conflict of interest

16

transactions, consummated in violation of her duty of loyalty owed to the Practices.  LeCann II, 2012 WL 5456095, at *8.  Although the Business Court found that defendant's disloyal transactions ultimately harmed the Practices, not every conflict of interest transaction causes injury.  See id.  In appropriate circumstances, a conflict of interest transaction may be defensible because it is fair, or even beneficial, to the corporation.  See N.C. Gen. Stat. § 55–8–31(a)(3).

In sum, on the facts of this case an award of punitive damages for willful conduct under North Carolina law does not satisfy the "willful and malicious injury" requirement, and thus cannot render the subject debt nondischargable.  The statute demands, and the Business Court's analysis examines only, the defendant's intent to undertake the relevant conduct; not whether defendant intended to cause harm.  In addition, even though an intentional act that "necessarily causes injury" is sufficient to satisfy the "willful and malicious injury" requirement, defendant's conflict of interest transactions, even though intentional, did not "necessarily" cause the Practices injury where such transactions potentially could be beneficial.  Accordingly, the bankruptcy court's reasoning was in error.

      3.     Defalcation in Fiduciary Capacity

Nevertheless, the bankruptcy court's judgment is affirmed, as the record demonstrates defendant incurred the subject debt as a result of "defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4).  A discharge claim made pursuant to § 523(a)(4) requires proof of two elements: 1) that the debt in issue arose while the debtor was acting in a fiduciary capacity; and 2) that the debt arose from the debtor's defalcation.  Pahlavi v. Ansari (In re Ansari), 113 F.3d 17, 20 (4th Cir. 1997).

17

The first element is satisfied on the facts of this case because the subject debt arose while defendant was acting in a "fiduciary capacity." "Fiduciary," as used in the bankruptcy code, is a term of art, which refers only to trust-like relationships.  See Davis v. Aetna Acceptance Co., 293 U.S. 328, 334 (1934); Hamby v. St. Paul Mercury Indem. Co., 217 F.2d 78, 80 (4th Cir. 1954). Broadly, these relationships fall into two categories:  express or technical trusts.

Commonly, a debtor acts in a "fiduciary" capacity when she is the trustee of an express trust existing between her and her creditor.  See, e.g., Davis, 293 U.S. at 334; Kubota Tractor Corp. v. Strack (In re Strack), 524 F.3d 493, 498–99 (4th Cir. 2008).  Whether or not an express trust exists, in turn, depends on the substance of the debtor-creditor relationship evaluated under the applicable state law of trusts.  See, e.g., id. at 498–99; Fowler & Peth, Inc. v. Regan (In re Regan), 477 F.3d 1209, 1211 & n.1 (10th Cir. 2007); Commonwealth Land Title Co. v. Blaszak (In re Blaszak), 397 F.3d 386, 391–92 (6th Cir. 2005); Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta), 394 F.3d 347, 351–52 (5th Cir. 2004); Hamby, 217 F.2d at 80; see also 4 Collier on Bankruptcy § 523.10(1)(d) (15th ed. rev. 2009).

However, a debtor also may be a "fiduciary" by virtue of her role in a "technical trust" relationship. See, e.g., Davis, 293 U.S. at 333; Republic of Rwanda v. Uwimana (In re Uwimana), 274 F.3d 806, 811 (4th Cir. 2001), abrogated on other grounds by Bullock v. BankChampaign, N.A., __ U.S. __, 133 S. Ct. 1754 (2013); Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes), 183 F.3d 162, 167–171 (2d Cir. 1999).  The existence of a "technical" trust relationship requires an analysis focused on the substance of the parties' relationship, Uwimana, 274 F.3d at 811 (applying § 523(a)(4) to an ambassador); Hayes, 183 F.3d at 167–68 (attorney handling client funds); Ansari, 113 F.3d at 20 (financial advisor); Hamby, 217 F.2d at 80 (real estate agent handling

18

closing funds).  In its first iteration, the bankruptcy code protected from discharge debts "created in consequences of a defalcation as a public officer, or as executor, administrator, guardian, or trustee, or while acting in any other fiduciary capacity."  Ch. IX, § 1, 5 Stat. 441 (1841).  These types of relationship generally are reflective of the category of "technical trust" covered under § 523(a)(4).  See Chapman v. Forsyth, 43 U.S. 202, 208 (1844); Davis, 293 U.S. at 333; see also, e.g., Hayes, 183 F.3d at 167 (noting that modern version of § 523(a)(4) has not changed in meaning since its original version; collecting cases).

To determine whether a "technical trust" exists, the court must examine the substance of the debtor's relationship with her putative trust-beneficiary.  See Uwimana, 274 F.3d at 811; Hamby, 217 F.2d at 80; see also Douglas G. Baird, Elements of Bankruptcy 47–48 (5th ed. 2010).  In analyzing the reality of the debtor's putative trust obligations, it is appropriate to consider the impact of state-law created obligations, voluntarily accepted by the debtor.  See, e.g., Ansari, 133 F.3d at 20; see also Am. Bankers Ins. Co. v. Maness, 101 F.3d 358, 363 (4th Cir. 1999) (generally, state law governs the contents of the federally created bankruptcy estate); cf. Chapman, 42 U.S. at 208–09 (noting the obligations voluntarily accepted by debtor owed to her creditor is the determinative consideration).  Debtor is not a "fiduciary" where trust-like obligations are imposed officiously.  See, e.g., Hamby, 217 F.2d at 80.  In addition, a debtor is not a "fiduciary" where state law, or the parties' own dealings, label her to be.  Id.  Rather, the most important consideration in a "fiduciary" analysis, for purposes of § 523(a)(4), is whether the debtor has voluntarily accepted trust-like obligations.

This case does not involve an express trust.  However, in her position as a director of the Practices, defendant voluntarily assumed trust-like obligations under North Carolina law, thus

19

placing her firmly in that category of "technical" trustees.  See Uwimana, 274 F.3d at 811.  As the director of a corporation, defendant had been entrusted with certain property and powers, which commanded from her undivided loyalty to the corporation and faithful service.  North Carolina law demands trust-like obligations from corporate directors.  For example, directors hold corporate assets in trust for the benefit of the corporation's stockholders and creditors.  Underwood v. Stafford, 270 N.C. 700, 702 (1967); accord Pender v. Speight, 159 N.C. 612, 615 (1912); Meiselman v. Meiselman, 58 N.C. App. 758, 775 (1982), aff'd as modified, 309 N.C. 279 (1983).  In addition, a director's powers are held in trust for the benefit of the corporation.  See Pepper v. Litton, 308 U.S. 295, 306 (1939).

The Business Court's judgment, as it relates to both the derivative breach of fiduciary duty and conflict of interest transaction claims, necessarily required the parties litigate defendant's director status under North Carolina law.  See, e.g., N.C. Gen. Stat. § 55–8–31(a); Meiselman v. Meiselman, 309 N.C. 279, 308 (1983); Governor's Club, Inc. v. Governor's Club Ltd. P'Ship, 152 N.C. App. 240, 249–50 (2002).  See generally LeCann II, 2012 WL 5456095, at *7–9.  In light of a director's obligation to hold corporate property and power in trust, and manage both for the benefit of the corporation; an obligation accepted by defendant when she became one of the Practices's directors, the Business Court's judgment preclude litigation of defendant's status as a fiduciary under the bankruptcy code.

The conclusion that defendant incurred the subject debt as a "fiduciary" is not the end of the relevant analysis.  To render the subject debt nondischargeable, plaintiffs also must prove that defendant incurred that debt as a result of fraud or defalcation while acting in her fiduciary capacity.  See 11 U.S.C. § 523(a)(4).

20

"Defalcation" is an intentional breach of trust and misappropriation of funds.  Bullock v. BankChampaign, N.A., __ U.S. __, 133 S. Ct. 1754, 1759 (2013).  The required "intent" element may be shown by either knowledge of, or gross recklessness in regard to, the improper nature of the relevant fiduciary behavior.  Id. at 1759–60.  Defalcation carries a different meaning than the other behaviors listed in § 523(a)(4):  embezzlement, larceny, and fraud.  See generally 11 U.S.C. § 523(a)(4).  Typically, embezzlement requires conversion, larceny requires carrying away another's property, and fraud requires a false statement.  Bullock, 133 S. Ct. at 1760.  By contrast, "defalcation" "can encompass a breach of fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity."  Id.  Rather, "defalcation" requires only a "nonfraudulent breach[] of fiduciary duty."  Id.

The Business Court's award of punitive damages is sufficient to preclude litigation of "defalcation."  That court awarded punitive damages based on its finding that defendant breached her duty of loyalty owed to the corporation by "knowingly and purposefully engag[ing] in repeated self-dealing and conflict-of-interest [trans]actions."  LeCann II, 2012 WL 5456095, at *8.  Under North Carolina law, punitive damages may only be awarded for "willful or wanton" conduct where the court finds the defendant acted in "conscious and intentional disregard of . . . the rights . . . of others."  N.C. Gen. Stat. § 1D–5(7).  The "conscious and intentional" standard supports the conclusion that defendant knew her behavior challenged in the Business Court was improper at the time it occurred.  The Business Court's findings indicate that defendant knowingly disregarded her fiduciary duty of loyalty owed to the Practices.  See, e.g., Meiselman, 309 N.C. at 307–08.  Thus,

21

the judgment at issue conclusively establishes that defendant purposefully acted in her own interest despite knowing that she was duty-bound to loyally serve the Practices's best interest.[5]

Defendant's arguments to the contrary are unavailing. Defendant first argues that reliance on state law in conducting a fiduciary analysis is misplaced, and that summary judgment should be denied under the prevailing federal "fiduciary" standard. Reliance on state law, however, is both necessary and appropriate in analyzing defendant's status as a fiduciary. State law, absent a countervailing federal interest, determines the contents of the federally created bankruptcy estate. Barnhill v. Johnson, 503 U.S. 393, 397–98 (1992); Maness, 101 F.3d at 363. For example, a fiduciary relationship created by "express trust," which defendant erroneously suggests is the singular allowable basis for fiduciary obligations under federal law, requires reference to state law in order to determine whether a valid express trust exists. See Strack, 524 F.3d at 498.

Moreover, the "technical trust" relationship that gives rise to "fiduciary" obligations in this and other cases, also permits reference to state law to determine the obligations voluntarily accepted by the putative fiduciary. See, e.g., Ansari, 113 F.3d at 20; see also, e.g., Strack, 524 F.3d at 498–99; Regan, 477 F.3d at 1211 & n.1; Blaszak, 397 F.3d at 391–92; Gupta, 394 F.3d at 351–52; Hamby, 217 F.2d at 80; Collier, supra. As discussed above, defendant is liable as a "fiduciary" under § 523(a)(4) because, under North Carolina law, she was entrusted with corporate powers and property by virtue of her directorship. See Pepper, 308 U.S. at 306; Underwood, 270 N.C. at 702.

In addition, the alternative analysis proposed by defendant, which she represents to be based on a rule developed by the Seventh Circuit, does not change the court's analysis. The Seventh

---

[5] At least one court has held that a debt incurred as a result of a fiduciary's breach of her duty of loyalty automatically constitutes "defalcation," rendering a debt nondischargeable. See Rutanen v. Baylis (In re Baylis), 313 F.3d 9, 20–21 (1st Cir. 2002) ("Defalcation may be presumed from breach of the duty of loyalty.").

Circuit's rule focuses on the imbalance of power between the putative fiduciary and the entity to which she purportedly owes her duties, and holds a debtor to be a fiduciary only where that balance of power exists. Defendant contends that were she and plaintiff LeCann owned equal shares of the Practices, the two were in equal positions of power. In essence, defendant argues that plaintiff LeCann could have stopped her surreptitious transfers had she tried.

The Seventh Circuit developed its approach over a series of cases. In Marchiando v. Illinois (In re Marchiando), 13 F.3d 1111 (7th Cir. 1994), the first in that line, the court held dischargeable a debt owed to the State of Illinois, incurred by a convenience store owner who misappropriated state lottery proceeds for her own benefit despite the fact that a state statute denominated the funds a "trust fund" until remitted to the state. Id. at 1113, 1115–17. In so holding, the court examined the parties' relative positions and reasoned that the statute imposed nothing more than a lien in the funds. Id. at 1116. The court buttressed its reasoning by discussing the "difference in knowledge or power between fiduciary and principal," ultimately concluding that the debtor was not "in a position of ascendency over" the state. Id.

In a subsequent case, In re Woldman, 92 F.3d 546 (7th Cir. 1996), the court again applied the balance of power rule and held dischargeable a debt owed by one lawyer to another, as a result of excess fees owed to the latter under a referral agreement which afforded to the former an opportunity to enter into a lucrative settlement. Id. at 546–47. On those facts, the court reasoned that the debtor did not owe a fiduciary duty to the other lawyer, notwithstanding the fact that state law would have labeled each a "fiduciary" of the other, because the "trust" at issue arose only after the debtor had failed to fulfill his obligation to remit an appropriate fee. Id. Again the court

23

observed that the plaintiff-creditor's claim was essentially for a breach of "trust" between equals. Id. at 547.

Finally, in *In re* Frain, 230 F.3d 1014 (7th Cir. 2000), the court exempted from discharge a debt owed by a majority shareholder of a closely-held corporation to two minority shareholders incurred when the majority shareholder, in his capacity as chief operating officer, paid shareholder distributions before repaying shareholder loans, in violation of the shareholder agreement between the parties. Id. at 1016–18. In holding that the debtor owed the minority shareholders a fiduciary duty, the court focused on the practical realities of their shareholder agreement and how that agreement placed the debtor in a position of "considerable" or "substantial" ascendency over the minority shareholders. Id. at 1017–18.

Turning now to the substance of defendant's argument, the Seventh Circuit's reasoning is inapt because it, at least it part, is inconsistent with binding Fourth Circuit precedent. Compare Uwimana, 274 F.3d at 811, with Woldman, 92 F.3d at 547. In Woldman, the Seventh Circuit noted that the only relevant inquiry for purposes of the fiduciary analysis is whether the relationship enabled the debtor potentially to misappropriate trust property. See 92 F.3d at 547. By contrast, the Fourth Circuit has suggested that "fiduciary" analysis is more holistic, noting that a duty of loyalty is a relevant consideration. Uwimana, 274 F.3d at 811.

Moreover, defendant's interpretation of those cases is not persuasive. Defendant represents the rule articulated in Marchiando as being the prevailing federal common law standard on the issue of fiduciary capacity. However, the Seventh Circuit itself has realized that the Marchiando rule does not supplant a more practical fiduciary analysis, which considers the obligations accepted by debtor and the impact those obligations have on the debtor's administration of funds or other property held

24

in trust.  See *In re* McGee, 353 F.3d 537, 540–41 (7th Cir. 2003) (observing that the rule in

Marchiando is "not a sine qua non"); see also Fowler Bros. v. Young (*In re* Young), 91 F.3d 1367,

1372 (10th Cir. 1996) ("Neither a general fiduciary duty of confidence, trust, loyalty, and good faith,

nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a

fiduciary relationship for purposes of dischargeability.") (internal citations omitted).  In addition,

the persuasiveness of those cases is reduced because the so-called Marchiando rule universally does

not appear to be the basis for the court's ultimate holding.  For example, the Marchiando court's

reasoning suggests that the cases' true holding is better understood to be that no "trust" relationship

existed because the "trust" sprang into existence only at the time the debtor failed to remit the ticket

receipts.  See 13 F.3d at 1115–16.  Likewise, in Woldman, the court's holding is better understood

to be that no "fiduciary" relationship existed because the "trust" in issue had "a purely nominal

existence until the wrong [was] committed."  92 F.3d at 547.

   In any case, however, even assuming the Seventh Circuit's balance of power test applies,

defendant cannot escape the fact that she was a "fiduciary."  In this case the judgment was rendered

derivatively in favor of plaintiff LeCann on behalf of the Practices.  Thus, the appropriate focus of

the court's analysis is the Practices's ability to combat defendant's breach of duty, not plaintiff

LeCann's ability as defendant suggests.  Like the minority shareholders in Frain, the Practices had

no escape valve; no meaningful way, on their own, to combat defendant's conflict of interests

transactions.  The Practices were separate legal entities, of which defendant was a director and

which were attacked from within.  They were wholly unable to protect themselves from her

damaging actions without the intervention of a stockholder, plaintiff LeCann, on their behalf.

Although defendant suggests the possibility of a derivative suit is enough to resolve this imbalance

25

in power, the court is not persuaded.  Possible action on behalf of the corporation, undertaken by a shareholder, is not sufficient to rectify the inherent imbalance of power between a corporation and its director. Moreover, defendant's reliance on <u>Frain</u> is particularly unavailing where <u>Marchiando</u>, the foundation upon which the reasoning of <u>Frain</u> rests, suggests that "a director's duty to his corporation's shareholders" is a fiduciary duty cognizable under § 523(a)(4).  13 F.3d at 1115.

Defendant next attempts to refute the court's conclusion that the Business Court's judgment provides no basis to support the conclusion that her breach of the duty of loyalty amounted to a "defalcation."  In particular, defendant contends that it is improper to conclude the issue of "defalcation" was actually litigated in the Business Court where the judgment contains no such finding or conclusion, and, in any event, that "defalcation" requires actual fraud.  Defendant's positions are plainly without merit.

Issue preclusion does not require the overly technical, obtuse analysis defendant suggests. To apply the principle of issue preclusion properly, the court must look beyond the formal labels given to particular causes of action and, instead, determine whether the legal issues which must be proved to sustain a judgment in favor of plaintiffs are identical to the issues pending for decision in a § 523(a) case.  <u>See, e.g.</u>, <u>Beckwith</u>, 326 N.C. at 574; <u>see also</u> <u>Combs</u>, 838 F.2d at 116–17.  Thus, defendant is collaterally estopped from litigating the issue of "defalcation," where a claim requiring resolution of the same legal issues was litigated previously.

In particular, "defalcation" covers breaches of duty the fiduciary knows to be improper, as well as those breaches of duty where the fiduciary is grossly reckless as to the impropriety of her conduct.  <u>Bullock</u>, 133 S. Ct. at 1759.  The issue of willfulness or wanton conduct, defined as "conscious and intentional disregard of . . . the rights . . . of others," was actually litigated before the

26

Business Court.  See LeCann II, 2012 WL 5456095, at *8; see also N.C. Gen. Stat. § 1D–5(7).

Because an award of punitive damages necessarily required the court conclude defendant knowingly

violated her duty of loyalty, this conclusion is the same as one required for a finding of defalcation

and thus properly is afforded preclusive effect.

Defendant next suggests that "defalcation" requires something akin to "actual fraud." (Def.'s

Br., DE 18, 46).  Section 523(a)(4) prohibits discharge of any debt incurred "for fraud or defalcation

while acting in a fiduciary capacity."  11 U.S.C. § 523(a)(4).  Defendant's argument focuses on a

passage from Bullock, wherein the Court stated that "the statutory term 'defalcation' should be

treated similarly" to the statutory definition of fraud.  Bullock, 133 S. Ct. at 1759.  As used in that

provision, "fraud" means "positive fraud, or fraud in fact, involving moral turpitude or intentional

wrong as does embezzlement; and not implied fraud, or fraud in law, which may exist without the

imputation of bad faith or immorality."  Neal v. Clark, 95 U.S. 704, 709 (1878).

Although the Court stated that "fraud" and "defalcation" should be "treated similarly," it

does not follow that defalcation requires a finding of fraud.  The Court's comments must be read not

only in the context of the litigation, but also in the larger context of the circuit split that Bullock

resolved.  In its efforts to define "defalcation" the Supreme Court noted that fraud, as well as the

other acts in the statute, included a scienter element.  Bullock, 133 S. Ct. at 1761.  Thus, treating

"defalcation" and "fraud" similarly means only that "defalcation" must require something more than

negligence.  In addition, the Court observed that its decision would resolve a split among the courts

of appeal on the level of intent required to for a breach of fiduciary duty to constitute "defalcation."

See id. at 1758 (collecting cases).  Moreover, collapsing the distinction between "fraud" and

"defalcation" violates the long-standing principle of statutory interpretation that the court "must try

to give every word in [a] statute meaning to avoid rendering its terms superfluous." Espinal-
Andrades v. Holder, 777 F.3d 163, 168 (4th Cir. 2015); Discover Bank v. Vaden, 396 F.3d 366, 369
(4th Cir. 2005).

Finally, defendant contends that, notwithstanding the similarity of the issues previously
litigated in the Business Court and the subject of the instant adversary proceeding, that she is entitled
to summary judgment because the issues raised by the instant adversary proceeding were not
material and necessary to the case below. As an initial matter, defendant conflates collateral
estoppel's identity element with its necessity element. As discussed at length above, the issues are
identical and thus raised previously. In any case, the issues determinative of the court's collateral
estoppel analysis were necessary, where defendant's status as a director was litigated in the course
of the Practices's conflict-of-interest transaction claim and the Business Court's conclusion as to
defendant's knowing breach of her duty of loyalty was essential to its award of punitive damages.

In sum, the court holds that plaintiffs' motion for summary judgment properly was granted
under § 523(a)(4) and that defendant's debt thus is not subject to discharge in bankruptcy. As a
director of the Practices, defendant owed a fiduciary duty to both those corporations and their
shareholders. Although that duty did not arise from an "express" trust, it did arise from a special
relationship where defendant was entrusted with certain powers and corporate assets. In addition,
the Business Court's award of punitive damages satisfies the standard for "defalcation" set out by
the Supreme Court in Bullock, 133 S. Ct. 1754. In particular, the Business Court found that
defendant knew she was violating the duties she owed to the Practices and, in doing so, acted with
a state of mind more culpable than gross negligence. The Business Court's findings of fact and

28

conclusions of law are sufficient to preclude defendant from relitigating the relevant issues in the bankruptcy court.

## CONCLUSION

Based on the foregoing, the judgment of the bankruptcy court is AFFIRMED. Because the facts and legal arguments are adequately presented in the briefs and record, the court dispenses with the argument requirement under Federal Rule of Bankruptcy Procedure 8019(b), as argument would not aid significantly the decisional process. The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 7th day of December, 2015.

LOUISE W. FLANAGAN
United States District Judge